Good morning. May it please the court. My name is Eitan Casteljanich. I'm representing Elizabeth Carter in this appeal. You're a very busy man this week. I am. Carter is disabled by a combination of physical and mental impairments including obesity, lumbar stenosis, degeneration, diabetes, personality disorder, depression, learning disorder, PTSD, OCD, and anxiety. Let me focus on the main issues that I see as the big errors by the ALJ that require reversal. First of all, Ms. Carter's treating physician through most of the time period here was Dr. Little, an osteopathic physician. And in his treatment notes, he documents many clinical findings which show that, for example, she had absent patellar reflexes. She had sensory changes in her left leg. He documented why she was having such problems. He also reviewed, he obtained and reviewed an MRI which supported his opinion that she was having problems. In June of 2010, he evaluated her and said that her overall work level was at sedentary. But he also noted that she had back pain that limited her ability to sit, walk, and carry. So he didn't say that she could do full-time sedentary work. He said that that was her overall, just a generalization, one-word summary. Now, he also found and opined that she had impaired concentration as a result of the pain that she was experiencing. The ALJ accepted the one-word sedentary but didn't mention the other findings in his report and didn't accept his opinion about her concentration problems, even though, as a treating physician, his opinion about mental impairments is also entitled to deference. So in addition, once the case was at the Appeals Council, he completed another evaluation in which he clarified that, in his opinion, she had been unable to perform any type of work since July of 2008 due to all of her problems. Which doctor are we discussing? This is Dr. Little, the treating physician. And he also opined that even if she had tried to work, he felt she was credible in her complaints because he had seen all the objective findings that supported her complaints and felt that she would have missed, would be absent three or more days per month on a more probable-than-not basis if she were to try to work. Now, I should mention, he based part of his opinion, in part, on a physical assessment that was done by Jerry Lynn Reinertsen, who's an occupational therapist. And she evaluated Carter twice. And in the second evaluation, which was in December 2009, she also found she was limited to sedentary work, but she also noted that she couldn't maintain competitive productivity levels in sitting, standing, and walking. I mean, there were a lot of problems going on that she thought would prevent her from performing competitive, at a competitive level. The ALJ said that she was giving great, accepting Ms. Reinertsen's opinion, but didn't discuss clinical findings that showed that Carter could not do full-time sedentary work, but that she also had other problems, in addition. The ALJ also erred by rejecting the opinion of a consultating, examining psychologist, Dr. Copeland. Now, what's interesting about Dr. Copeland's opinion is he listed a bunch of clinical findings that he observed that supported his opinion. His basic opinion was that she didn't appear to be capable of working on a consistent basis, or able to deal with the usual stress encountered in competitive work. Now, ALJ rejected Dr. Copeland's opinion because, supposedly, he relied too much on her subjective complaints. But what's interesting about that is, in the report that he completed for Social Security, Social Security hired him to do this evaluation. The instructions for how he's supposed to do that evaluation include that he's supposed to ask her about her complaints and list all of her complaints. If he had ignored those and hadn't mentioned them, his report would have been deficient. Perhaps it would have even been rejected. But counsel, isn't it also true that when an ALJ permissibly discounts extent of pain testimony, the ALJ also can, by the same amount, discount the history given to medical providers that says the same thing? If someone is exaggerating in one context, then it doesn't help support the other context. So, isn't that fair game? Well, that's correct. Except in this case, it's not fair game because the ALJ didn't state any convincing reason for rejecting any of Carter's testimony. Well, I know it sounded from your argument like you were suggesting that the whole exercise was improper. But it sounds now like what you're saying is just in this instance, in your view, the reasons were not sufficient. Is that your argument? Well, the ALJ's reason is not correct because, for one thing, an ALJ cannot reject an examining physician's opinion simply because the examining physician considered the subjective complaints of the claimant. But that's not what happened. I think it was more saying that by accepting an exaggerated list of symptoms, the opinion itself is discounted to the same extent as the exaggeration itself. And isn't that okay if there's support for it? Dr. Copeland did not base his opinion primarily on subjective complaints. He documented, if there had been no well-documented objective clinical findings in his report, if his report included nothing but subjective complaints, then what you're saying is exactly correct. It could be discounted if her subjective complaints were properly discounted. But that's not this that his overall opinion was based on his clinical findings, so not on her description of her symptoms. And once again, I don't think that the ALJ stated any, not a single convincing reason for rejecting her symptoms. Why wasn't the ALJ entitled to rely on the opinion of Dr. Robinson? I believe he was the non-examining psychologist who reviewed Ms. Carter's records and concluded that Ms. Carter was capable of working in a non-public setting. Dr. Robinson did not review any records after the date that he filled out the checkbox form that he filled out. He never met her. He's a non-examining physician. And his opinion was inconsistent with the opinions of Jeanette Rive, who's a psychiatric nurse who evaluated Carter. His opinion was inconsistent with Dr. Copeland's opinion. And as a general rule, the opinions of people who've actually examined an individual are entitled to greater weight. Now, the ALJ is the one who has to weigh the evidence and determine, well, why am I, I a non-examining physician's opinion could outweigh that. Go ahead. I'm sorry. How should we treat the somewhat, I think, substantial evidence of Ms. Carter's malingering and exaggeration of her symptoms? Does that, because it's, that's in the record, does that evidence only bear on the credibility of her testimony? Or could the ALJ have also discounted the clinical findings regarding her mental health on that basis? Well, there is no finding of malingering in this file. And there is no diagnosis of malingering. And the key evidence here, she applied for benefits in September of 2010. There's a lot of references to malingering by the doctors who examined her. There is not reference to frank malingering in this file. I thought one of the records said one of the diagnoses was malingering. An exaggeration of her symptoms. Are we talking about the one that was in 2005? Well, I have a couple of notes here that says, can't remember which doctor it was, but. Here's a, it's a problem in this case that the. This is Jeanette Rive, A-R-N-P. Diagnostic Code. What is a malingering? V65.2, I think, or 160, I can't tell. It's a page, it's numbered several different ways. Oh boy, 266, 300, it's got a lot of different numbers on it. Well, I'll address that in my rebuttal, I think it's more appropriate than trying to look at that right now. The issue here is that Ms. Carter's condition has gotten worse over time. She was injured on the job. One of the reasons that she was found to be not credible was because supposedly she was hanging out at Walmart with her friends. That was in 2005. She applied for benefits. How are her daily activities, as she reported them, consistent with any finding that she had a debilitating mental health condition? Her activities at the time, from the time that she applied for benefits here, were basically staying home most of the time. There were days she didn't even get out of bed. Well, that's not entirely fair. She's writing a book, she's looking for a publisher, she's seeing her boyfriend and going on the bus. It seemed like she was pretty busy. That's a fair question. Let me answer it. She was in special education her entire education. Yes, she's writing sonnets and children's books. However, it took her 29 tries to pass the driving test, the written driving test. This woman has a serious learning disability. The fact that one of her hobbies is writing things down, this is not realistic. There's no evidence that she's able to actually write something that is marketable, is a polite way to put it. The Dr. Lewis report says that she won a blue ribbon for photography. I'm sorry, I can't hear you. She won a blue ribbon for photography, which suggests that she wasn't just spinning wheels. I, once again, I don't know when that was and how far. 2007. There was that in school when she was still, 2007? Well, it doesn't say that. It says concentration for two or more hours, and it gives a list of things that she does. Baking courses, photography, won blue ribbon. I'm sorry, who are you citing to? Is this Dr. Robinson? I'm sorry? Who are you citing to? The Dr. Lewis report from 10-17-07. Well, it's interesting that in 2010, Dr. Lewis evaluated her again and found that she was very much impaired. And it's a much, this is part of the Appeals Council evidence. It was dated only one month after, less than a month after the ALJ's decision. And so I think that that gives a better, a more complete description of the real picture from 2008. We're talking about an application in July of 2008. So evidence from 05 and 06, or even 07, doesn't tell us how she's been doing since July of 08. How should the ALJ have translated, I think it's Dr. Sattar's opinion, into concrete functional limitations? You know, the most significant thing about Dr. Sattar's opinion is that his findings of depression, his clinical findings are consistent with the findings of Dr. Copeland. I don't think that it was so much needed to be translated as it needed to be acknowledged. Well, because Dr. Sattar herself doesn't describe that limitation. No, he doesn't. So it's more significant because it's consistent with Dr. Copeland. And it's consistent with the more recent evidence from both Ms. Rivea and from Dr. Lewis. I would like to re- Okay. Thank you. Yes, sir. Good morning, Your Honors. Gerald Hill for the government. May it please the court. I'll start by addressing the major errors that the claimant's attorney identified. But I do count about 12 issues before the court, so I would be happy for you to redirect me. Let's start with Dr. Copeland. I think that's what gives me the most pause in his report. It looks like Dr. Copeland found that Ms. Carter's psychological challenges were very debilitating, so debilitating that she could not work in any capacity. He examined her. He also reviewed her records. And it looks like that opinion seems to be pretty broadly consistent with the other treating psychiatrists, which the ALJ completely failed to discuss. Dr. Sattar? Uh-huh. And so I'm just trying to figure out why the ALJ would have been justified in giving that opinion of minimal weight. Dr. Copeland's opinion? Yes. So the express reasons given by the ALJ were reliance on the claimant's subjective statements, which the ALJ- This is what I don't understand. He said any psychiatric evaluation goes with reliance on subjective statements. How can you do a psychiatric evaluation and not rely on subjective statements? It's totally permissible for the psychiatric examiner to rely on the claimant's subjective statements, and it's permissible for the ALJ, who has a different function than the examiner, to determine the weight to give the claimant's statements. Well, I understand that, but how can he reject it simply because it relies on subjective statements? I mean, I understand he can say I'm rejecting it because I disbelieve her, but you can't say I reject it, as Judge Graber was saying. But how can you reject it just because it relies on subjective statements? There's no way to evaluate somebody psychiatrically without relying on subjective statements. Yes, the examiner does have to take account of the claimant's subjective statements, and then it's up to the ALJ to determine whether those statements deserve weight. But that's not what he said. What I understood is on several different occasions, with regard to several different doctors, including Dr. Copeland, he rejected basically all the ones who thought that she did have serious mental health or cognitive issues. He said, I'm rejecting it because you relied on subjective statements. And I've seen that elsewhere, and I've never understood it, because it's simply putting your head in the sand about what psychologists and psychiatrists do. It is what they do, and I don't perceive the ALJ as faulting the psychiatrist for doing that. It's just a factor that the ALJ- He's saying because they did it, I'm not going to credit them. I'm going to credit somebody else who also has a reliance on that. I had a question about that, too, because with respect to Dr. Copeland, at least, the ALJ said two things. One is that it relied on the claimant's subjective complaints, but the other was that the opinion was not consistent with the claimant's testimony about her own level of activities in the world, which is quite a different statement than just saying relied on the subjective complaints. And I guess I'd like you to comment on that aspect of it, whether that's an appropriate reason to give less weight to an opinion, to say the testimony we've heard is not consistent with the opinion. That is an appropriate consideration, and that is another reason that the ALJ gave. And this Court's decision in Morgan v. Commissioner 1999 establishes that a claimant's activities is a valid basis on which to, for an ALJ to discount a medical opinion. So those were two express reasons that the ALJ gave. They seem to run against each other. What's that? They seem to run against each other. Well, in this case, the claimant made some inconsistent statements about her activities and why she stopped working. She told Dr. I know, so he faulted her for relying on her reports and for not relying on her reports. Well, the ALJ has to come up with a, in this case, there are conflicting medical opinions, and the ALJ has to decide which ones to credit. I understand that, but how can he discount a single person for both relying on her reports and not relying on her reports? Well, I guess what I'm saying. Well, there's no indication that she told the doctor the same things she testified to. We don't have any information about that one way or the other, so I'm not sure how we deal with that. How does that relate? I guess I just want to know, how does that relate exactly, I mean, to Dr. Copeland's assessment? Well, here's an example. She told Dr. Copeland that she had to quit her job at Walmart because she couldn't deal with the people and because of fear and anxiety. She testified that she quit that job because she couldn't do the exertional demands of the job, and other evidence that the court has pointed to show that her social activities are inconsistent with statements, the kind of statements she made to Dr. Copeland, that she wasn't able to work because of fear and anxiety and inability to deal with people. So what is inconsistent with that? She's given inconsistent reasons for why she couldn't handle that job as a cashier at Walmart working with the public. And so that's part of the basis of Dr. Copeland's opinion is based on her statements about her social abilities when she has made different statements elsewhere in the record that the ALJ considered and that Dr. Robinson considered, who, by the way, did review Dr. Copeland's report and other evidence. Although, I mean, should we consider Dr. Robinson's non-examining report to be contradictory, I mean, for purposes of determining whether the ALJ was required to provide clear and convincing reasons for rejecting Dr. Copeland's report? Your question is, should the court? Dr. Robinson didn't examine her. He wasn't a treating physician. Right. True. I mean, is that your main reason? So in terms of the standard of review, whether the clear and convincing reasons standard applies, Dr. Copeland's report is contradicted by other medical opinions, including Dr. Robinson's opinion. What other one? I mean, what other one? Because he seemed to be pretty consistent. Dr. Lewis's report is inconsistent with Dr. Cloak. In what way? She finds no more than moderate cognitive and social limitations. That's Dr. Lewis, and she's the one who talked about the activities at the State Fair and all the claimants' interests. And then there is Dr. Howick's report, and she also is an examining psychologist, and she also found no more than moderate cognitive and social limitations. And so her and Dr. Lewis, just going back to Dr. Lewis really quickly, she's the one who also found that the claimant would be capable of working in a non-public job. Were they physical doctors or mental doctors? No, these are psychologists. It looks like the ALJ agreed at step two that Ms. Carter suffered from the severe impairments of anxiety, personality disorder with borderline antisocial traits and depression. And if you could tell me how that finding was incorporated in the residual functional capacity determination and the hypothetical post to the vocational expert. The limitation to non-public work accounts for the anxiety, and the limitation to simple repetitive tasks accounts for other moderate mental functional limitations found by these examining psychologists. And we get there by Dr. Robinson's opinion, which the ALJ largely took as translating these sort of checkbox form opinions. He relies a lot on Dr. Robinson, who was, again, didn't examine her, was non-treating, and I'm just not sure if that's... So the legal principle that makes that permissible is the Tonopetian case, and that's a Tonopetian case, the 2001 case, 242F3 at 1149, that an ALJ can rely on non-examining source reports as substantial evidence when those reports are consistent with the reports of examining sources, such as Dr. Lewis and Dr. Howick, and also Ms. McAvoy as well. You say the repetitive and the other thing was sufficient to incorporate anxiety, personality disorder, and borderline antisocial traits and depression. Well, there's not a... Two aspects of the hypo were sufficient? I believe that's the extent of the mental health limitations. This is another somewhat global statement, but I don't understand. Since we have the same underlying documents that Dr. Robinson was looking at, and I've never understood what it adds. I mean, if you have a medical issue, a physical medical issue, I suppose there could be some value added from somebody evaluating. But with the psychological report, he's simply giving us his view of what the same documents we're looking at say, right? Dr. Robinson? Yes. So I don't understand why you give it any weight at all rather than reading the documents yourself, the ALJ or us. Well, the ALJ is the one to give it weight or not. I understand it, but it just has no value added as far as I can tell.  Well, the Stubbs-Danielson case permits this technique of relying on a psychologist. Is it a mental health situation? Yes, it is a mental health situation, 539 F3rd at 1174 to 75. The doctor can translate these, what are checkbox assessments of moderate functional limitations, because the question becomes what do those mean and how do they get translated into an RFC assessment. Would anybody ever rely for their own treatment on an evaluation of that kind, somebody looking at a bunch of pieces of paper and checkboxes? Never, never. I've never understood it. Anyway, go ahead. Well, I think the overall principle is that it's a psychologist who is an expert and the ALJ is not the psychiatric medicine expert, and so that expert will translate the checkbox statements of symptoms into a workable residual functional capacity assessment or finding, and then the ALJ can adopt that in whole or in part, as he or she can with any other expert opinion. And as I said, the technique is approved in the Stubbs-Danielson case. I thought there was also case law saying that the ultimate question of the functional capacity is not a medical question, it's a question for the ALJ. It is based on all the evidence and it is the ALJ's determination. That's certainly true. And the ALJ is not bound by what Dr. Robinson or a non-examining source or any other source says. The ALJ has to base that residual functional capacity assessment on all the evidence, but he or she does have the option of relying on the reviewing psychologist, if that's reasonable to do so.  Well, Dr. Robinson's opinion is a reasonable translation of Dr. Lewis's opinion, that the claimant was capable of non-public work. Also, Ms. McEvoy's statement, and also Dr. Howick's statements, that there were really no more than moderate mental functional limitations here, which they're not per se disabling. What about the ALJ not discussing it at all, Dr. Satters? The ALJ didn't identify that doctor by name as step two in determining whether the claimant had severe mental impairments. The ALJ did cite that exhibit and recited the findings on that exhibit concerning the diagnoses. The ALJ did not revisit it in the discussion of the residual functional capacity assessment and did not address the GAF score. But this court has not, in a precedential opinion to my knowledge, required GAF scores to be evaluated. They are on the way out, not included in the latest version of the DSM-5, due to subject to misinterpretation or reliability. The commissioner, as this court recognized in the McFarland case, indicated that's an unpublished case, but indicated it's in the brief. The commissioner has indicated that GAF scores do not directly correlate with the severity of mental impairments under the special technique for evaluating mental impairments. At best, I think we could have a harmless error situation, but really I don't think there's any error here because Dr. Sattar did not give a definitive or much of any statement about what the claimant could do in a work setting. We don't really know the basis for that GAF score. He didn't explain it. I would also say that at the time that Dr. Sattar issued that opinion in 2006, he was not the claimant's treating psychiatrist. He became the treating psychiatrist later, but that was his first examination of the claimant. Then he saw the claimant three or four times after that in a three- or four-year period for medication management, and his notes reflect that the claimant was doing pretty well. Subsequently, when she did engage in treatment, he did have a note in September 2008 that said that the claimant had failed at that time, dropped out of treatment, and was noncompliant, which supports one of the LJ's findings in this case. You've exceeded your time, so could you wrap up? Yes, I would just say in this case there are contradictory medical opinions on both sides, and under the Tonopetian case there's a combination of treating, examining, and non-examining opinions, and those are not only substantial evidence for the RFC assessment and for the rejection of contrary medical opinions. In that case, the court held that those examining physicians and psychologists' opinions constitute specific and legitimate reasons. So when the ALJ sets out the conflicting evidence in this style and interprets it and makes all the required findings, the reason-giving requirement is satisfied. Okay, thank you very much. So thank you. Let me start by answering your question about the malingering reference. That was in Jeanette Reve's report from March 2008. Jeanette Reve is an ARNP who saw, as near as we can tell, she never treated, but she did examine Carter once. She's not qualified to make a diagnosis. That's why the ALJ, nobody could rely on a diagnosis. She is not qualified under Social Security regulations to diagnose anything. And in fact, if you look at her evaluation, she then continued to find that there were many significant functional limitations. Once again, it's March 2008. The relevant time period here starts in July. The other thing, the reliance on activities. My opposing counsel discussed Dr. Lewis, which is from June of 2007, and Dr. Houck, which is from October 2003 and October 2005. Carter's activities in 2003, 2005, and 2007 are not a convincing reason to reject her testimony about her activities since July of 2008. Her condition had gotten considerably worse. Can you remind me which of these doctors were treating doctors? Dr. Sattar, Dr. Copeland? Dr. Copeland was not treating. He was examining, but he was hired by Social Security. Not that that makes a real difference in the analysis. None of the others were, though. Dr. Lewis was an examiner. Dr. Houck was an examiner. But those are, like I said, those are the old records. One other thing I need to mention is the— The only treating physician was Dr. Sattar? The only treating psychiatrist, yes. With regard to the failure to mention Dr. Sattar's clinical findings, I think that's more significant even than the GAF score. The GAF score is a number. You can get an idea from that. But without narrative and— Counsel, what specifically, in your view, is inconsistent between what Dr. Sattar said and the RFC that was utilized? Well, there's no exact inconsistency, but the important part is that he described his clinical findings of her affect being depressed and how dysfunctional she was, concentration problems. But, counsel, didn't he— The ALJ found that to be a severe impairment, and that's why I'm asking you the question, because I don't see Dr. Sattar's report as really saying anything about specific work limitations that would be inconsistent with the RFC. I agree with you. The issue, though, is that his clinical findings are consistent with Dr. Copeland's findings, and Dr. Copeland did state a clear opinion, which was improperly rejected in part because the ALJ didn't acknowledge that it was consistent with Dr. Sattar's findings. So it's that consistency that matters. It's not—by itself, it doesn't tell us anything. Dr. Sattar's findings seem to be that her thought processes are coherent and goal-directed, no perceptual disturbances. Her insight is good. Her judgment is good. Her cognition is fairly good, etc. So what did he say that was anywhere that was consistent with, as Judge Graber asked you, a different evaluation of her ability to work? The specific things that he said, he found that her mood was depressed, her affect was stable, constricted, and blunted. She endorsed paranoia and vague auditory visual hallucinations. He again then, in another opinion, found that her affect was blunted and constricted. I'm not saying that this is a lot of evidence. I'm saying this evidence is, on the whole, consistent with Dr. Copeland's opinion, but most significantly, this also is from prior to July 2008. This helps with the historical perspective, but from July 2008 on, Dr. Copeland's is the most significant evidence here, and the ALJ did not state even any legitimate reason for rejecting it, especially because the activity conflict was all based on activities that she was engaging in prior to her alleged onset date. Okay, thank you very much. Your time is more than up. We will submit the case of Cardo versus Colvin. We will take a ten-minute break.
judges: Graber, Berzon, Murguia